UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------------x
J.F.J. and E.Y, individually and on behalf of J.J.
A Student with a Disability,

                                        Plaintiffs,

                                                            **COMPLAINT**
    -    against –                                          2:22-cv-00966

GREAT NECK UNION FREE SCHOOL DISTRICT AND
BOARD OF EDUCATION, DR. TERESA PRENDERGAST,
Superintendent of Schools of the Great Neck School District, DR.
JOSEPH HICKEY, Assistant Superintendent of Schools of the
Great Neck School District, DR. KENNETH DAVIDOW,
Supervisor, Secondary Special Education, of the Great Neck
School District and Chairperson of the Committee on Special
Education ("CSE"), DR. AGNIESZKA DYNDA, School
Psychologist of the Great Neck School District and Case
Manager of the CSE, MS. ELLICE GELLER,  as Supervisor of
Elem. Special Education in the Great Neck School District and
Member of the CSE,  MS. JERYL LEHMULLER, member of the
CSE in the Great Neck School District,   MS. DANIELLE
LARSON, as a member of the CSE in the Great Neck School
District,    each Individually,    and    in    their    respective
official capacities

                                        Defendants.
-------------------------------------------------------------------------x

          Plaintiffs J.F.J. and E.Y., individually and on behalf of J.J, by their attorneys Littman

Krooks LLP, as and for their Complaint, respectfully allege and state as follows:

**NATURE OF ACTION**

          1.      This is an action for compensatory damages, tuition reimbursement and attorney's

fees,  resulting from Defendants' intentionally acting in such a manner and under color of state

law as to violate Plaintiffs' rights under the Individuals with Disabilities Education Improvement

Act ("IDEIA"), Section 504 of the Rehabilitation Act of 1974 ("Section 504"), 42 U.S.C. §794,

the Americans with Disabilities Act ("ADA"), 42 U.S.C. §12132, and the Fourteenth Amendment to the Constitution, 42 U.S.C. §§1981, 1983.

2.     Throughout J.J.'s educational career, the Board, the District and the individual Defendants in their individual and official capacities ("Defendants") both denied J.J. a Free Appropriate Public Education ("FAPE") and discriminated against J.J. by showing gross misjudgment and deliberate indifference to his needs and formed their own view of J.J. which guided all subsequent actions: he was a student with cognitive disability who could not progress on grade level instruction, who was designated for Alternate Assessments ("AA"), and who belonged in the most restrictive classes and would not benefit from instruction with typical peers. The Defendants, in lock step, maintained discriminatory positions that J.J. could not understand grade level work and would never go to college and were recalcitrant in insisting that J.J. should remain in very restrictive classes and thus deprived him of educational opportunities.

3.     The Plaintiffs bring this action to, *inter alia,* seek a modified *de novo* review of the administrative record, and based on such review, respectfully request that this Court:

   a. To partially uphold the final administrative decision of the New York State Education Department's Office of State Review ("SRO Decision") dated October 22, 2021, as to the finding of a denial of a FAPE to J.J. (Exhibit B) and to uphold the Impartial Hearing Officer ("IHO") Decision (Exhibit A) regarding tuition reimbursement and other relief;
   b. Declare that Fusion Academy was an appropriate placement for J.J., as it provided specially tailored services and remedied deficiencies in the District program, and uphold the IHO finding and order on tuition reimbursement and reverse the portion of the SRO Decision which held that Fusion Academy was not an appropriate placement for J.J. and award full tuition reimbursement;
   c. Based on the denial of FAPE, rule that the Plaintiffs are entitled to additional compensatory services and damages;
   d. Declare that the Defendants violated Section 504 and the ADA through their discriminatory practices and bad faith and gross misjudgment and award additional appropriate compensatory relief and damages; and
   e. Award all attorney fees and prejudgment interest.

**THE PARTIES**

4.     All Plaintiffs are residents of the State of New York and have resided at all relevant times during the proceedings, at an address within the Great Neck Union Free School District ("Great Neck"), and currently reside at an address within the Eastern District of New York in Great Neck, New York.

5.     Although well known to Defendant, Plaintiffs are not expressly named herein by their given names because of the privacy guarantees provided in the IDEIA as well as in the Family Educational Rights Privacy Act (FERPA), 20 U.S.C. § 1232(g) and 34 C.F.R. § 99.

6.     Defendant Great Neck is a "local educational agency" and school district organized under the laws of the State of New York.

7.     The Defendant Board of Education is the policy-making body of Great Neck.

8.     Great Neck is a public entity which receives federal financial assistance.

9.     Both procedurally and substantively, Defendant was and still is statutorily responsible under the IDEIA, as well as the laws of the State of New York, to provide J.J. with a FAPE and to comply with Section 504 and the ADA.

10.     Plaintiffs J.F.J. ("Mr. J.") and E.Y, are, respectively, the father and mother of J.J.

11.     Defendant Dr. Prendergast is employed as the District's Superintendent of Schools and is sued in her individual capacity as well as her official capacity.  As such, she is a state actor for purposes of 42 U.S.C. §1983.

12.     As Superintendent of Schools, Defendant Prendergast is one of the District agents responsible for the compliance with the District's statutory obligation to provide a FAPE to disabled students and to comply with federal and state law to educate all students in the LRE.

13.     Defendant Dr. Joseph Hickey is the District's Assistant Superintendent in Great Neck and in charge of special education and is sued in his individual and official capacities.

Defendant Hickey establishes and implements policy for the District. As such, he is a "state actor" for purposes of 42 U.S.C § 1983.

14.     Defendant Dr. Kenneth Davidow is the District's Supervisor, Secondary Special Education in Great Neck and a member and chairperson of the District's CSE and is sued individually and in his official capacity.  Defendant Davidow establishes and implements policy for the District.  As such, he is a state actor for purposes of 42 U.S.C §1983.

15.     Defendant Dr. Agnieszka Dynda is employed as a School Psychologist in Great Neck and a Case Manager of the CSE.  She is sued in her individual and in her official capacity. Defendant Dynda establishes and implements policy for the District.  As such, she is a state actor for purposes of 42 U.S.C §1983.

16.     Defendant Ellice Geller is Supervisor of Special Education in Great Neck and member of the CSE.  She is sued in her individual and in her official capacity. Defendant Geller establishes and implements policy for the District. As such, she is a state actor for purposes of 42 U.S.C §1983.

17.     Defendant Jeryl Lehmuller was J.J.'s teacher in sixth grade and is a member of the CSE in Great Neck. She is sued in her individual and in her official capacity. Defendant Lehmuller implements policy for the District. As such, she is a state actor for purposes of 42 U.S.C §1983.

18.     Defendant Danielle Larson is a teacher in Great Neck and a member of the CSE in Great Neck.  She is sued in her individual and in her official capacity. Defendant Larson implements policy for the District.  As such, she is a state actor for purposes of 42 U.S.C §1983.

**JURISDICTION**

19.     This Court has jurisdiction pursuant to 20 U.S.C. § 1415(i)(2)(A), 28 U.S.C. § 1331 and § 1367 without regard to the amount in controversy.

20.     This Court is authorized to grant Plaintiffs' prayer for relief regarding reasonable attorney's fees under 42 U.S.C. §1988, 20 U.S.C. §1415(i)(3), 42 U.S.C. §121133, and 29 U.S.C. §794 (a)(2).

21.     Venue is proper as Plaintiffs and Defendants all reside or are situated or employed within this judicial district, within the boundaries of the Eastern District of New York

22.      Plaintiffs have fully exhausted their administrative remedies as to claims herein.

**FACTUAL ALLEGATIONS**

**Statutory Framework**

**Individuals with Disabilities Education Improvement Act of 2004 ("IDEIA" or "IDEA")**

23.     Congress enacted the IDEIA to ensure that public schools identify students with disabilities and provide them a FAPE.

24.     By the beginning of each school year, a district must develop an Individualized Education Program ("IEP") that offers FAPE to each eligible child. 20 U.S.C. § 1414(d)(2).

25.     To provide children with disabilities a FAPE, students with disabilities must be placed in the least restrictive environment ("LRE") and to the maximum extent appropriate, must be educated with children who are not disabled. 20 U.S.C. §§ 1400(d) 1412(a)(1-5).

26.     The IEP offered must be "reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Endrew F. ex, Rel, Joseph F. v. Douglas County School Dist.*, 137 S.Ct. 988, 993 (2017). Under the IDEIA, "[a] student offered an educational program providing "merely more than *de minimis*" progress from year to year can hardly be said to have been offered an education at all."

27.     In New York, a CSE is responsible for recommending evaluations, development of IEPs, placement of students in appropriate programs in the LRE and the IEP implementation. N.Y. Educ. Law § 4410; 8 N.Y.C.R.R. § 200.3(a)(1).

28.     Pursuant to the IDEIA and its implementing regulations, each child with a disability must be individually evaluated in all areas of suspected disability and assessed by a multidisciplinary team responsible for developing an IEP. 20 U.S.C. § 1414(a) and (b).

29.     The IDEA requires that each child's IEP must include annual goals to enable the child to be involved in and make progress in the general education curriculum, and a statement of the special education and related services and supplementary aids and services to enable the child to be involved and make progress in the general education curriculum, which is the same curriculum as that offered to non-disabled students. 34 C.F.R. §300.320 (a).[1]

**IDEA Regulations on Alternate Assessment**

30.     The IDEIA Regulations, amended in 2015 to align with ESSA,[2] provide that all children with disabilities must be included in all general State and district-wide assessment programs, with appropriate accommodations and alternate assessments, only, if necessary, as indicated in their respective IEPs.  34 C.F.R. §300.160 (a).

31.     The IDEIA Regulations provide that only students with "the most significant cognitive disabilities" should take alternate assessments based on alternate achievement standards.

32.     New York State Regulations, which have not been updated in accordance with ESSA, provide that students with severe disabilities may be designated for AA:

---

[1]     Congress first prioritized access to the general curriculum in IDEA 1997: "Over 20 years of research and experience has demonstrated that the education of students with disabilities can be made more effective by having high expectations for such children and *ensuring their access in the general curriculum* to the maximum extent possible." 20 U.S.C. § 1400(c)(5)(A) (1997) (emphasis added). In IDEIA 2004, Congress amended the term to the "general education curriculum." The Record uses terms "general curriculum" and "general education curriculum" interchangeably.

[2]     The Elementary and Secondary Education Act ("Every Student Succeed Act"), 20 USC 6311(b)(2)(D)(I)(i) (2015), provides that a state may provide for alternate assessments aligned with alternate achievement standards for students with the most significant cognitive disabilities if the State ensures, among other things, that parents are informed how participation in such assessments may delay or otherwise affect the student from completing the requirements for a regular high school diploma.

*Students with severe disabilities* means students who have limited cognitive abilities *combined* with behavioral and/or physical limitations *and* who require highly specialized education, social, psychological *and* medical services in order to maximize their full potential for useful and meaningful participation in society and for self-fulfillment. Students with severe disabilities may experience severe speech, language, and/or perceptual-cognitive impairments, *and* evidence challenging behaviors that interfere with learning and socialization opportunities…

8 N.Y.C.R.R. §100.1(t)(2)(iv) (emphasis supplied).

33.    New York Education Law does not allow students on AA to earn a high school diploma but receive a Skills and Achievement Credential (SACC). 8 N.Y.C.R.R. § 100.6(a).

**Section 504 of the Rehabilitation Act of 1973 ("Section 504")**

34.    Section 504 is a federal civil rights law that prohibits discrimination against individuals on the basis of disability in any activity or program that receives federal funding.

35.    Under Section 504, a person is deemed disabled if he or she (1) suffers from "a physical or mental impairment that substantially limits one or more major life activities"; (2) has "a record of such an impairment"; and (3) is "regarded as having such an impairment."

36.    Section 504 provides that "[n]o otherwise qualified individual with a disability in the United States ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance ..." 29 U.S.C. § 794(a).

**Americans with Disabilities Act of 1990 (the "ADA")**

37.    The ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

38.    An individual is disabled under the ADA if he or she (1) suffers from "a physical or mental impairment that substantially limits one or more major life activities"; (2) has "a

record of such an impairment" and (3) is "regarded as having such an impairment." 42 U.S.C. § 12102(1)(A)-(C).

39. The Parents have brought this action under the IDEIA, Section 504 and the ADA, which prohibit unnecessary segregation and require steps and accommodations to provide opportunities for participation of people with disabilities together with non-disabled persons.[3]

**The Student J.J.**

40. This Complaint involves a student, J.J., a ninth-grade student with autism who is currently unilaterally placed by his Parents at Fusion Academy ("Fusion").

41. J.J. is a polite and friendly young man, who is uniformly described as respectful, compliant and eager to please.

42. While J.J. has many strengths, as with many students with autism, language, particularly expressive language, is an area of weakness for J.J. With individualized support at Fusion, he is working to comprehend books at his grade level and to respond to inferential questions and is on grade level in math.

43. J.J., like most students without disabilities, aspires to achieve a high school diploma and to attend college to achieve his post-secondary goal of attending an undergraduate conservatory to study classical music.

44. J.J. plays classical Viola at the college level. He attends the highly competitive Juilliard Precollege Program, one of the foremost music preparatory programs in the world where students participate in intensive ensemble instruction, intensive private instruction and

---

[3] The House Judiciary Committee emphasized that the central purpose of § 504 was to integrate people with disabilities into all areas of the life of our society. *See* H.R. REP. at 49. Thus, the consistent legislative history of § 504 from its introduction in 1972 to its amendment in the Americans with Disabilities Act, 42 U.S.C. § 12101, fully supports the Parents' advocacy of compelling the District to include J.J. in classes with non-disabled peers.

intensive music theory lessons that are very similar to what students experience at the undergraduate level in a conservatory.

45.     At Juilliard, his teachers report that he is "a very, very hard-working student who is a highly proficient musician as well, and very polite and well-behaved student."

46.     J.J.'s future attendance at a music conservatory is a realistic and obtainable goal, as Ms. Anne Cohen, an expert in music education, testified at the hearing. The only path to pursue a career as an orchestral musician is to attend an undergraduate institution for classical music, such as a conservatory. There is no equivalency in a certificate program. A high school diploma is a prerequisite for admission to a conservatory, as for all colleges.

**J.J.'s Education in Great Neck**

47.     J.J. had been receiving special education and related services in Great Neck pursuant to an IEP since Kindergarten.

48.     J.J. attended schools in Great Neck during his entire educational career until the middle of the 6th grade. From first grade on, he was relegated to restrictive classes and deprived of educational opportunity. In April 2016, when planning for the 4th grade, the District moved him from a 12:1+1 class to an even more restrictive 8:1:1 class.

49.     From April 2016 on, J.J. was, due to gross misjudgment and bad faith, designated as a student with a severe cognitive disability and placed on Alternative Assessments ("AA") and thus deprived of the opportunity to work on the general education curriculum and to work toward state assessments, and no actor in the District told the Parents that this designation would affect his ability to achieve a high school diploma, as required by ESSA and the IDEIA.

50.     The record reflects that the District has focused on J.J.'s language difficulties and need for "prompting" as an incorrect reason to deprive him of access to general education classrooms and curriculum and to put him on the trajectory to not receive a high school diploma.

51.     Rather than support his areas of difficulty with additional supplementary aids and services in a less restrictive placement, the District only kept J.J. in the same program for year after year with no additional aids, even though he made little if any progress and regressed.

52.     Except for Kindergarten and one orchestra class per year, the District has segregated J.J. to restrictive placements in the District.  Beyond Kindergarten and orchestra, he has never been included in a General Education or Integrated Co-Taught (ICT) academic class in the District. The IEPs from 2016-2020 indicate that the parent requested mainstreaming or at a minimum placement in a 12:1+1 class and also that the District disregarded parental input.

53.      In Great Neck, in 2018, when J.J. was only in the sixth grade, Dr. Davidow, as CSE chairperson, told Mr. J. that J.J. would never go to college as it was not "realistic"

54.     The Defendants' view of J.J. has been wrong and discriminatory.

55.     The Defendants possessed reports on J.J.'s academic abilities in music through the New York State School Music Association ("NYSSMA").  His Parents provided the District with documents reflecting J.J.'s musical ability, including sheet music, emails on his proficiency, videos, and Juilliard transcripts, as well as information on J.J.'s college aspirations.

56.     The CSE elected to ignore this information and not a single member, since J.J.'s 4th grade year, ever explored his academic music ability or tried to educate themselves but remained deliberately indifferent to his needs.

57.     The Defendants deprived J.J. of educational opportunity and excluded him from participation with non-disabled peers in the general education curriculum.

**The Great Neck Continuum of Services**

58.     Great Neck has created a continuum of services to segregate students with autism and other disabilities from the general population, under the guise of providing "more support." Upon information and belief, NYSED has found Great Neck failed to meet LRE standards.

59.     The District continuum includes related services and resource room, which can be provided to students placed exclusively in general education classrooms and integrated co-taught classes, a special class (Core class) in each academic subject area limited to 15 students, and a 12:1+1 special class where students with disabilities study all subjects.

60.     Next on the continuum are the segregated classes almost exclusively serving students on AA:  J.J.'s 8:1+2 self-contained class, and then a smaller self-contained class that services the most disabled population.

61.     The Core and ICT classes follow a Regents curriculum; academic expectations are higher than the special classes and close to grade level.  Great Neck students who are on AA are not included in these or any general education academic classrooms.

62.     Throughout testimony, district witnesses explained the set expectations for students in ICT, Core, and 12:1+1 classes and why J.J. could not have access to these classes.

**J.J.'s Educational Background in Great Neck**

**2012-2013 School Year**

63.     For J.J.'s IEP meeting for his Kindergarten year, the Parent noted that he was doing well and mainstreamed in preschool. J.J. was described as "sweet and cooperative."

64.     For Kindergarten, the team recommended placement in an ICT class.

65.     The Parent reported on the student's home language background in Korean. The District stated that the Student would be screened for Teaching English as a Second Language services ("TESL") upon entering the District but this never occurred.

**2013-2014 School Year: Restrictive Placement in Special Class**

66.     When the CSE convened for the IEP for the 2013-2014 school year, his teacher reported that he enjoyed coming to school and that he greeted his teachers.

67.     J.J. was decoding above grade level and making progress.   Yet the CSE, without consideration of an aide or other supplementary services, recommended a more restrictive 12:1+1 class, which was still, however, progressing in the general education curriculum.

**2014-2015 School Year**

68.     For J.J.'s second grade year, the CSE met in March 2014, during J.J.'s first grade year and again recommended the 12:1+1 setting. His IEP notes that he made progress and was working on the first-grade level.  There was still no follow up on the TESL screening.

69.     The District evaluated J.J. in December 2014. On the Psychological Re-Evaluation, J.J. was "able to complete all tasks with minimal direction."  J.J. had several average cognitive abilities, including visual and spatial processing, problem solving and reasoning skills. Of the six (6) subtests in the Differential Abilities Scales, Second Edition (DAS II), he performed significantly below normal limits only on the Word Definition subtest (one of the two subtests that measured his verbal skills).

70.     Exemplifying the District's underestimation and lack of care on J.J.'s abilities, the Evaluation incorrectly reported that J.J.'s score on Verbal Similarities was in the *Deficient* Range, when his score, in the 16th percentile, was in the *Low Average* Range.

71.     In an Educational Evaluation in 2014, J.J. performed in the Superior Range in Math Fluency (92nd percentile) and either the Superior or Very Proficient Range in Math Calculation Skills (94th percentile) Calculation (90th percentile). Other scores were within the average range, with the exception of Applied Problems and Academic Apps. Passage comprehension was in the low average range. His academic skills were within normal limits.

72.      Indeed, before he was placed in more restrictive classes, J.J.'s skills were reported near average, and he was making some progress.   Dr. Dynda noted that as to J.J.'s decoding and mathematical calculations, "he was probably one of the highest in the class…"

73.     In first grade, even in word problems, Dr. Dynda further noted that, in the area of getting answers, all the students struggled and "J.J. probably compared similar to where the other kids were." His Reading Level was E (which was Kindergarten level, close to his grade level).

74.     J.J. was making educational progress.  In third grade, on his report card, he was evaluated on all subject areas and was meeting standards and scoring a 3 in almost 20 areas, such as mastering sight words, applying strategies to determine word meaning, reading with appropriate pacing and math calculations.

**2015-2016 School Year**

75.     On March 19, 2015, the CSE convened an Annual Review/Re-Evaluation meeting to develop J.J.'s IEP for the 2015-2016 school year.

76.     The IEP noted that J.J.'s re-evaluation indicated *average* scores in reading, writing, and math, except in the area of applied problems and passage comprehension.

**Current Appeal**

**Denial of FAPE and Relegation to More Restrictive Class: 2016-2017 School Year**

77.     The CSE convened on April 16, 2016, to plan for J.J.'s fourth grade year.   The CSE did not review evaluations. The CSE members reported that J.J. made limited progress, but the Parents did not wholly agree.  Indeed, at that point, Mr. J. had been satisfied with the 12:1+1.

78.      The Parents asked about reading comprehension support, but the CSE refused to provide specialized reading support.

79.     The CSE recommended a restrictive 8:1+2 classroom placement based only on J.J.'s  language struggles, rather than adding additional specialized services.[4]

---

[4]      No District witness explained why J.J.'s need for independence in third grade outweighed his right under the IDEIA to meet challenging objectives, to progress in the general curriculum and be placed with typical peers. District witnesses repeatedly voiced the concern that J.J. needed "prompting."  This was used to keep J.J. in segregated classes. Ms. Geller stated that the CSE did consider an aide for the

80.     Dr. Dynda noted the "difference" between J.J. and other students in the 12:1+1 and less restrictive placements.

81.     Ms. Geller stated that, as a reason to justify a more restrictive placement, for fourth grade, "above all, he was not able to be independent." Dr. Dynda noted that, in third grade, J.J. enjoyed school and his peers. She said he could not engage with peers but failed to recommend additional specialized services to help him do so.

82.     The CSE made this decision on a restrictive placement without discussing the option of a 1:1 teaching assistant ("TA") or indeed *any* additional supports.   Indeed, the CSE's sole consideration was to move J.J. to the more restrictive 8:1+2 class.

83.     The Parents voiced concerns, as the benefits that J.J. would derive from his peers would diminish.  The CSE said that the language demand in the 12:1+1 class was greater and J.J. would struggle.  Ms. Geller assured Mr. J. that J.J. would be placed in the 12:1+1 class for math.

**Inappropriate Alternate Assessment Designation**

84.     The CSE made an erroneous and discriminatory decision to designate J.J. for AA, without finding that J.J. met all the criteria and without informing the Parents of the impact.

85.     The CSE and the District never provided the Parents with the information required on the effect of such a designation, in violation of the IDEIA Regulations and of the procedures required by the ESSA.

86.     Ms. Geller, although she testified that she read from a form, had erroneous information on alternative assessments and believed that a severe cognitive disability meant that a student was more than "2 years below average."

---

12:1+1 but they thought, without providing it or trying it, that this would make him more prompt dependent.  Again, without discussion of additional support for his language, she also cited his inability to participate in an activity called Turn and Talk as a justification for a more restrictive classroom.

87.     Ms. Geller, an experienced educator, did not know that she was required to inform parents, that the AA designation impacted the student's ability to achieve a high school diploma.

88.     Dr. Dynda, who is a Neuropsychologist and was J.J.'s Case Manager, acknowledged that she did not understand the AA process or high school diploma options for students with disabilities.

89.     Dr. Dynda further admitted that she did not know that a student who remained on AA would not be eligible to receive a high school diploma and did not think the law required any notification on diploma options (although the IDEIA required this notification as of 2015).

90.     The District's own documentation on the IEP indicates that the CSE recommended AA "due to significant language deficits," proving the District made a grave mistake of not applying the accurate criteria in order to designate J.J. with AA.

91.     Mr. J. also testified that the discussion on AA centered on the language deficits.

92.     In making this decision, the CSE did not discuss or review J.J.'s previous Woodcock Johnson Achievement results from the year before, which indicated that he was more than capable of performing not only far above the level required for an AA designation, but at his actual grade level. The CSE did not conduct additional evaluations before this decision.

93.     The District did not consider any testing accommodations J.J. could receive on state assessments before this decision.

94.     The CSE did not discuss the change in curriculum or notify the Parents that J.J. would be working on alternate achievement standards.

95.     Thus, in April 2016 and at meetings after, showing gross misjudgment and bad faith, the District and individual Defendants at this meeting, withheld required information from the Parents contrary to the IDEIA and ESSA, and failed to properly inform the Parents of the consequences of the 8:1+2 placement and AA designation.

96.     Mr. J. testified that he did not disagree at the April 2016 meeting, as he was not informed of the ramifications of AA on diploma options, but did disagree in November 2018, when he learned from counsel that J.J. was not on a trajectory to receive a high school diploma.

97.     The record reflects that the District sent no notice about AA after the meeting.

**District Fails to Implement IEP in 2016-2017 School Year**

98.     To reassure the Parent about the placement, the CSE members said J.J. would be placed in math in a 12:1+1. Ms. Geller noted the CSE recommended giving him part of a day in a 12:1 classroom. The IEP comments state it is for math and specials.

99.     The Parents relied on this, but the District never placed J.J. in the 12:1+1 math class, except for two weeks, despite the IEP placement. Rather, the District deliberately removed him, as the teacher thought he could not do the work.

100.    The District never informed the father and did not call J.J.'s mother, as Ms. Geller had claimed that the District did.

101.     Dr. Dynda acknowledged that the Parent was not informed of the math change.

102.    On the mid-year IEP produced in Dec. 2016, the District falsely represented that J.J. was in 12:1+1 for specials and math.

**J.J. Failed to Make Progress During 2016-2017 School Year**

103.    Ultimately, J.J.'s transition to a more restrictive setting stalled his progress and the record reflects that it led to lower expectations and goals and regression of his abilities. J.J. talked less about school and his interactions at home with other students stopped. His Report Card for 2016-2017 has no scores in the general education curriculum except Science and PE.

104.    District witnesses confirmed that he made only limited progress in 2016-2017. Dr. Dynda even put the burden on J.J., as "he wasn't using peer modeling to help himself." Although the goals were repeated from the prior year, he only achieved 6 out of 12.

**2017-2018 School Year**

105.     The CSE convened on May 31, 2017 and maintained the same placement for J.J.'s fifth grade year, with no additional services, despite his limited progress. The CSE added the restrictive Adaptive Physical Education ("PE") to J.J.'s IEP without discussion.

106.     The CSE did not consider an ICT or 12:1+1, or other options, even with supplementary aids and services.

107.     Dr. Dynda maintained for example, that J.J. could not perform comparably to where the 12:1+1 students were performing.

108.     Again, the CSE did not notify the Parents of the effect of the AA designation on J.J.'s ability to achieve a high school diploma. The IEP stated that J.J. was designated for AA given his language reasoning, reading comprehension and communication skill deficits. There was no discussion. The District had knowledge of J.J.'s great music ability but did not consider his unique needs and circumstances.

**J.J. Fails to Make Progress During 2017-2018 School Year**

109.     J.J. did not make progress during the 2017-2018 school year.

110.     Ms. Geller only acknowledged depressingly d*e minimis* progress such as his initiating greetings to people that he knew. He started to be able to fill out occasional little parts of the graphic organizers that year. She continued to describe J.J.'s need for "prompting" in his writing. Dr. Dynda noted that he was not progressing in reading.

111.     J.J.'s Report Card from this time is completely blank, as he was no longer progressing in the fifth-grade curriculum, except for PE, in which he received 3s and 4s.

112.     The classroom observation during a speech lesson showed that J.J. was compliant but working on very basic work of identifying adjectives to describe animals. His goals were very basic and repeated, but still he only achieved 8 of 12.

**2018-2019 School Year**

113.     On March 28, 2018, the CSE convened a Re-Evaluation/Annual Review Meeting. The reports shared at the meeting continued to indicate that J.J. was making *de minimis*, inadequate progress. The CSE continued to note the same difficulties on J.J.'s IEP that they had for years. His reading level remained stagnant at the Teachers College K level through the entire school year as he continued to struggle with comprehension due to inadequate supports and services. Ms. Geller acknowledged that he was stuck at the very beginning of inferencing.

114.     Yet despite this minimal progress, the CSE only considered the 8:1+2 class.

115.     The CSE failed to consider an ICT or 12:1+1 and did not consider what supplementary aids or supports J.J. could receive in a less restrictive setting.

116.     Reasons for not considering a general education or 12:1+1 class were inappropriate and discriminatory. For example, Dr. Dynda testified that J.J. would not have "fit in" socially with the 12:1+1 students.  When asked if he could benefit from ICT or 12:1+1, Dr. Dynda claimed the language was too rich, beyond his understanding.

117.     J.J.'s placement for the 2018-2019 school year was again in an 8:1+2 class, Adaptive PE and with inappropriate services.

118.     With no discussion, the CSE again inappropriately recommended AA and failed to inform the Parent of any effect of AA on a high school diploma.  Even though this meeting was planning for middle school, Ms. Geller believed she did not have to notify the parent about diploma options regarding AA.  The Parent did not formally disagree with the IEP until November 2018 when he became aware of the effects of AA.

**J.J.'s Tutor, Ms. Sagliocca's Work**

119.     Ms. Bianca Sagliocca began tutoring J.J. in or about summer 2013, starting at the beginning of the 2013-2014 school year and for the next few years until around 2015, and then

later in 2019. She has worked with J.J. two to three days per week, two hours per session. She is a certified special education teacher who works in an ICT class. From 2013-15, she and J.J. were working on both ELA and math skills. For ELA, she and J.J. worked on categorizing, identifying the main idea, making inferences, and reading comprehension.

120. Ms. Sagliocca opined that: "J.J., as a student, is easy to underestimate, as he is quiet and it can take him time to warm up. He needs the right environment and challenge, as well as time, to show what he can do." She further opined that, based on her work with J.J. and her knowledge of the criteria for alternate assessment, he did not meet those criteria.

**Student is Placed in Functional Skills ABA Class in 2018-2019**

121. J.J. began middle school in September 2018. Mr. J. noticed during the first few weeks of school that J.J. was doing work he had done in early elementary school such as matching heads and tails on pennies, telling time and first grade level reading.

122. On October 2, 2018, the Parents asked his teacher, Ms. Lehmuller, about reading homework, orchestra and J.J.'s reading level. Ms. Lehmuller did not answer his questions.

123. J.J. regressed academically in sixth grade in the very restrictive class without appropriate support. The District has produced no report cards. The data shows regression from fifth grade, lack of progress on goals, and very low-level work.[5]

124. The low expectations became self-fulfilling, and Ms. Lehmuller noted that his work declined. She had no explanation for his limited progress in reading except that there are "many factors that can influence assessment." She testified that he was an inconsistent learner.

---

[5] At the hearing, Ms. Lehmuller attempted to show that J.J. was one of the lowest in the class by comparing J.J.'s work with work of another student, whom she claimed was not the highest functioning writing student in the class, but "average." Ms. Lehmuller later admitted the work was a work of a student with the highest writing score (by far) in the class when the class profile was shown to her. Thus, the argument is not only not credible but also exemplifies how she tried to undermine J.J.

125. J.J. was a very concrete learner and needed multiple choice questions, but Ms. Lehmuller insisted that he not look on a page for an answer for example, for "why questions." Ms. Lehmuller noted he needed one-to-one support.

126. As to social emotional needs, Ms. Lehmuller acknowledged that J.J. did not make progress; he became more anxious. His IEP lacked any social emotional goals to address this. J.J.'s behavior regressed in Ms. Lehmuller's class. Ms. Lehmuller testified his behavioral issues were "intensive" based on what she termed perseverating, which was moderate self-talk and need for praise.[6] She stated J.J.'s behavior interfered with learning but did not recommend an FBA.[7]

127. J.J.'s regression occurred at the same time that his curriculum changed to be more focused on life skills and functional academics.

128. Ms. Lehmuller acknowledged that her class focused on life skills. The work that she provided the Parent on Google classroom and on reading assignments shows that it was on the elementary level and focused on life skills such as basic coin recognition, matching heads and tails of pennies, and tracing letters. She confirmed that Google Classroom was "where she would post whole group work as well as individual work."

129. Ms. Larson confirmed that Ms. Lehmuller's classes were more functional and life-skills based, not curriculum-based. Daily reports did not include academic information.

130. In her class, Ms. Lehmuller reported that J.J. was not even able to answer basic WH questions, which he had been working on in first grade.

131. In contrast, J.J. showed that he was able to make progress on grade-level work with his tutor. During J.J.'s sixth grade year at Great Neck, his tutor Ms. Sagliocca worked with J.J. in math. She used sixth grade math materials with him and worked on concepts such as

---

[6] Dr. Jerry Wishner noted that the self-talk was not disruptive and served a positive function for J.J.
[7] District witnesses did not testify about behaviors before the sixth grade. Dr. Dynda and all testified that J.J. was always compliant, polite and eager to please.

ratios, rates, proportions, addition/subtraction and multiplication/division of fractions, and word problems with fractions and decimals. She taught him three days per week, in two-hour sessions.

132.    The Parents had shared their concerns and frustration with her about the lack of math material J.J. was receiving and showed J.J.'s work with his tutor to Ms. Lehmuller.

**October 24, 2018 CSE**

133.    During the October CSE program review, the Parent shared concern that J.J. was not being challenged academically in his 8:1+2 class and requested placement in the 12:1+1.

134.    The Parent shared the goal of J.J. attending a music college after high school, noting that his music tutor, a Julliard faculty member, estimated that J.J.'s current skills on the Viola were near the college level.

135.    Dr. Davidow, the CSE Chairperson, stated that the Parents should consider whether the goal of a music college was realistic. This indicated that the District had predetermined that J.J., in only the 6th grade, would not be on a college path. The Parent remembered that he said, "You need to be realistic. There is no way he is going to be able to handle a college curriculum."

136.    The CSE did not even mention AA or inform the Parent of the effect of AA on J.J.'s ability to achieve a diploma, at the October meeting, even though Dr. Davidow then knew that J.J. had goals of attending a music conservatory.

137.    At this meeting, the CSE finally told the Parent that because J.J. was on AA, that was the reason there was no set curriculum.

138.    The CSE disregarded the Parent's express disagreement with J.J.'s placement and recommended that J.J. continue his placement in the 8:1+2 classroom, though the Parent requested a 12:1+1. The CSE rejected a less restrictive 12:1+1 classroom; indeed, there was no discussion of any less restrictive setting, except for orchestra.

139.	After the CSE, on October 29, 2018, the Parent asked Ms. Lehmuller about J.J.'s reading, which had regressed dramatically since the prior academic year.  Ms. Lehmuller reported his comprehension at the pre-primer level in 6th grade, although in the 5th grade, J.J. was reading at an independent Level K, which equates to the end of second grade.

140.	Ms. Lehmuller, in testimony, confirmed that his reading instructional level was at pre-primer level. At home, with Ms. Sagliocca, he was working on Level M.  Given the District's conflicting data, on November 1, 2018, the Department Chair of Special Education at J.J.'s school, explained to Mr. J. that Ms. Lehmuller would be conducting a Teachers College Reading Assessment to have an accurate measure of progress, regression or maintenance."  Ms. Lehmuller testified that she never conducted the Teachers College Reading Assessment.

141.	Upon Mr. J.'s request, the Department Chair also sent him the curriculum that the 12:1+1 class was working on, which was close to grade level, with some accommodations.  A comparison of the 8:1+2 curriculum and the 12:1+1 curriculum shows that J.J. was denied access to grade level content and work toward a high school diploma, based on his disability and the gross misjudgment of the District and individual staff members.

**December 12, 2018 CSE**

142.	After the October meeting, the Parents through counsel sent a formal letter of disagreement on November 14, 2018 and requested a CSE meeting. The Parent also asked a private psychologist, E. Christina Kim, Ph.D., to evaluate J.J.

143.	The District staff, in anticipation of the CSE meeting in language that can only be described as negative and retaliatory, termed the Parent a "heavy hitter."

144.	The CSE convened on December 12, 2018. Ms. Lehmuller testified that at the time, J.J. was engaging in "high levels" of giggling, impeding his ability to learn. Yet at the CSE, she stated that J.J.: "Does not demonstrate any significant negative behaviors in the classroom."

145.     As part of her evaluation, Dr. Kim administered evaluations, including the Wechsler Intelligence Test for Children – Fifth Edition ("WISC-V"). J.J. received a Full-Scale IQ score of 84, at the 14th percentile and a Fluid Reasoning Index of 85 at the 16th percentile, both in the Low Average Range. His Verbal Comprehension Index of 68 was at the 2nd percentile and Working Memory Index of 74 was at the 4th percentile. His Processing Speed score of 111, at the 77th percentile was in the High Average Range and his Visual Spatial Score of 92, at the 30th percentile fell in the Average Range.

146.     Dr. Kim recommended that J.J. receive school accommodations in the least restrictive setting, where he could have increased exposure for socialization and recreational activities with peers. She specifically noted that "[J.J.] needs appropriate peer models and the opportunity to participate in a rich and verbal classroom experience."

147.     Dr. Kim noted that "[J.J.] does not exhibit [a] severe cognitive disability that would indicate the need for AA. Although he has significant verbal and communication deficits and educational delays, he has the ability and potential to work toward grade level standards."

148.     The District wholly disregarded this evaluation, as CSE Case Manager Dr. Bowman claimed that it was invalid due to practice effect guidelines, indicating that tests were repeated too closely. However, Dr. Davidow acknowledged that Dr. Dynda had noted that any practice effect shows that a student could learn.

149.     Ms. Larson, a special education teacher in the District, had never taught J.J. and only observed him for 15 minutes, twice.  Her testimony revealed her deep misunderstanding of the LRE and gross misjudgment; she never mentioned accommodations or modifications J.J.

could receive and was essentially stating that J.J. would have to be excluded from the less restrictive placements as his writing was not up to standards.[8]

150.   The CSE had no answer to explain J.J.'s reported 3-year regression in reading, from second grade level in the 5th grade to pre-kindergarten level in the 6th grade.  Dr. Davidow dismissed Parent's serious concerns on J.J.'s reading levels and instead chose to ignore the drastically conflicting reading levels by stating they were just disagreeing about "some letters."

151.   Consistent with the dramatic regression in reading levels, the IEP contained goals on the Kindergarten to 1st grade level (after J.J.'s prior goals had been at the mid second grade level).  At the meeting, when the Parent requested higher goals, Ms. Lehmuller responded: "I can't teach him something on a second-grade level when he's running on (grade) level one. He needs to master that before we can move on."   Many of the goals were recycled.

152.   The CSE inappropriately continued to recommend AA despite strong parental objection. Dr. Davidow said that J.J. could not access the New York State tests, benefit from the tests or do well on the tests.   He asked CSE members if anyone disagreed with the AA designation but none did.

153.   Again, the CSE members did not discuss diploma repercussions of AA.

154.   The CSE only considered one placement, in the 8:1+2[9] and refused to consider J.J.'s needs to receive interaction with non-disabled peers and peer models in the 12:1+1.

_____

[8]      Ms. Larson, Ms. Geller and Dr. Dynda all testified to show what would have been expected of J.J. in an ICT or 12:1+1 class.  Ms. Larson testified extensively about these expectations.   Indeed, she was asked, "If an ICT child was writing this, how would it differ?" Much of her testimony critiqued J.J.'s work.   She noted his work was not nearly up to seventh grade standards in an ICT class or 12:1+1. Similarly, as to work that J.J. did with his tutor, during 2018-2019, Ms. Larson made similar belittling comments and analysis of J.J.'s work as "plot summary." She inappropriately noted that J.J.'s work was not something she would have expected from a sixth grader in an ICT class or from a student in a 12:1+1.
[9]      Dr. Kim's evaluation indicated that J.J.'s abilities and current level of functioning are significantly higher than the profile of other students in his current 8:1:2 class and more in line with the profile of students in the 12:1+1 class, yet the District disregarded this.

155.     The CSE rejected a less restrictive 12:1+1 classroom or any other placement for J.J.  The CSE members only discussed the general education classrooms and why he could not be in the 12:1+1 classroom and did not discuss or consider any benefits. Dr. Davidow testified that J.J. did not have necessary cognitive, academic and language skills to meaningfully access the 12:1+1 curriculum and peer modeling.

156.     Although witnesses acknowledged that support, including modification, breaking down materials, repetition and practice for skills could be provided in a 12:1+1 classroom, the CSE continued to recommend an 8:1+2 class and Adaptive PE and inadequate related services.

**Parents Provide Notice of Unilateral Placement: J.J. Begins at Fusion Academy**

157.     In a letter dated January 22, 2019, the Parents, through counsel, notified the District that they rejected the December 12, 2018 IEP as it was inappropriate to meet J.J.'s needs.

158.      The Parents shared their belief that J.J. has been set up for failure based on the District's failure to provide J.J. with a FAPE with an appropriate program in light of his unique circumstances for the 2016-2017, 2017-2018, and 2018-2019 school years, and the District's steadfast adherence to their positions and inappropriate underestimation of J.J.'s abilities.

159.     The Parents also provided notice that due to J.J.'s continued lack of progress and decompensation in the isolated 8 1:2 classroom, and given no viable options by the District, the Parents were unilaterally placing J.J. at Fusion which provides 1:1 instruction, specially designed services for J.J.'s unique learning needs and appropriate work on his level, as well as an understanding of his autism and interaction with typical peers.

160.     J.J. began attending Fusion on January 28, 2019.

161.     Ms.  Serena Carlisi, who is a special education teacher, specially designed a program and instruction for J.J. She saw that he needed 1:1 special education instruction as well

as accommodations and supplementary aids and supports. J.J. works toward challenging work in the general education curriculum, with 1:1 support, repetition and time.

**2019-2020 School Year**

162.　　At the CSE on June 19, 2019, to share information, the Parent brought binders of J.J.'s worksheets at Fusion but the CSE did not review them.

163.　　After significant regression in the District, J.J. was making dramatic progress. Mr. J. explained that J.J.'s work level at Fusion was higher than in Great Neck, as the Fusion work was close to grade level for J.J. Dr. Davidow acknowledged that he "barely looked at it."

164.　　The Parent presented the complex sheet music for "Der Schwanendreher," concerto for viola by Hindemith that J.J. had recently mastered to Dr. Davidow, chairperson.

165.　　The Parent asked whether a child with a severe cognitive disability would be able to process, memorize and master the Hindemith concerto. The chairperson refused to look at the music sheet and claimed he did not know music. He said that he knew J.J. was talented in music but "that has nothing to do with his academics.at school." Of the 8 attendees present on the District side at this CSE meeting, not a single person attempted to look at the sheet music. The Parent disagreed with this dismissal, as cognitive abilities are not limited to the verbal domain.

166.　　The CSE reviewed Fusion progress reports. The ELA teacher reported that J.J. was doing very well in her class. She confirmed that she used visual cues as needed, reworded questions and walked him through the writing process. His science teacher reported that he was only "a little bit below grade level." His math teacher reported that J.J. was performing excellently. He confirmed that he gave J.J. worksheets to allow him to practice the material and that since J.J. was having problems with reading comprehension, he gave more word problems. He was able to solve almost all problems given as numbers. His history teacher reported that he was doing fairly well and put forth best efforts but struggled with reading comprehension. J.J.

had not been exposed to history or science in the ABA functional skills class. CSE members uniformly overstated negatives for J.J. and undermined positives.

167. Showing gross misjudgment to J.J.'s abilities, Ms. Larson stated at the June 2019 CSE that J.J. had "no comprehension."

168. After discussions at the CSE on goals, the Chairperson stated, "Based on what everyone is saying, we believe an 8:1+2 setting is appropriate for him." CSE members did not consider an ICT or 12:1+1 or discuss what supplementary aids could be available or any benefits of a 12:1+1 or an ICT class. Dr. Davidow acknowledged in testimony that "We didn't think a 12:1+1 was appropriate. We certainly weren't going to consider a general education classroom."

169. The CSE again insisted on designating J.J. as eligible for AA solely due to language deficits. The Parent noted that Dr. Davidow had not explained the basis of their determination, as he kept referring to J.J.'s verbal and language skills.

170. When Dr. Davidow insisted J.J. should be designated AA, the Parent asked, "you are only including the verbal component of that, right?" and Dr. Davidow responded: "Right." Again, the Parent noted that J.J. had many average scores on evaluations in measuring cognitive skills, but Dr. Davidow claimed that those were not the scores required to be successful in school even though the District's own evaluation described them as "five (5) different cognitive abilities that are critical for academic achievement" in which J.J. scored average on three (3) and below average on one (1). Dr. Davidow used J.J.'s 8:1+2 placement to justify his designation as a Student on AA. The District did not understand the criteria for AA nor discuss diploma options.

171. The Parent shared J.J.'s acceptance at the Juilliard pre-college program but Dr. Davidow only asked the Parent if Juilliard was shown the IEP or evaluations. The Parent testified that the school attorney answered for the Parent and stated, "the answer is no."

172.    The Parent found it offensive, outrageous and discriminatory and the very question implied that had Juilliard seen the IEP or evaluations, they would not have accepted J.J.

173.    Dr. Davidow further said that although J.J. was talented musically, "that does not mean he can access a college curriculum," but then he admitted that he neither knew specific information on the music college curriculum nor the support that would be offered for students with disabilities at a music college.

174.    In contravention of Parent input and disregard of reported progress at Fusion, the CSE recommended continued placement in an 8:1+2 classroom and Adaptive PE. On the June 2019 IEP, the District added a goal for adaptive PE (Goal #19) without even discussing it at the CSE.  Although Dr. Davidow claimed they did discuss it, the audio reveals no discussion.  In addition, J.J.'s Annual Review Report notes no physical or motor special education needs.

175.    In a letter to CSE dated June 18, 2019, the Parents expressed disagreement with the CSE's determination, as J.J.'s cognitive profile did not indicate severe cognitive disabilities and he does not meet the NYSAA guidelines for eligibility of alternate assessment.

176.    After the CSE on July 9, 2019, the Parent emailed Dr. Bowman 44 pages of J.J.'s work at Fusion. However, the District never responded or reconvened until June 2020. When he received no response, he wrote a formal letter of disagreement, through counsel, that he was placing J.J. at Fusion for the 2019-2020 school year.

**Success at Fusion Academy**

177.    Beginning with J.J.'s first semester at Fusion Academy, he made significant progress.  He was exposed to grade level curriculum and was progressing in the general education curriculum.  Although he has continued to make academic progress in all subjects, according to the Fusion Academic Summary, he continues to struggle with reading

comprehension, vocabulary, language and analysis due, in part, to his regression caused by the denial of FAPE and the lack of exposure in the general education curriculum.

178.     J.J. is on track to receive a Fusion High School Diploma.

**Dr. Wishner's Evaluation and Recommendations**

179.     The Parents sought an independent educational evaluation from Dr. Jerry Wishner, Ph.D. in Summer 2019. Dr. Wishner has been a special education teacher, has prepared general and special education teachers while a professor of educational psychology at NYU, and has observed many classes at Chappaqua while Director of Pupil Personnel Services there.

180.     The Parent provided the Report to the District on September 25, 2019. Dr. Davidow never responded; the CSE did not convene during that school year, until June 2020.

181.     Dr. Wishner met with J.J. and the parents, observed him at school, conferred with his teacher and reviewed J.J.'s educational records. Dr. Wishner noted that both English and Korean are spoken at home, and that while English is thought to be J.J.'s primary language, he:

> can express some thoughts in Korean, and capably switches between languages based upon with whom he is communicating. Though competence and facility are clearly not equivalent in each language at this time, J.J.'s language development and acquisition have included more than one language. Such dual language backgrounds become an important consideration when interpreting results of tests standardized upon single language learners.

182.     Dr. Wishner administered the standardized Multiple Choice Verbal Comprehension Index (MCVCI), which was comprised of the Similarities and Vocabulary subtests of the WISC-V Integrated, to assess J.J.'s verbal comprehension without requiring any expressive responses, "presenting a potentially more appropriate estimate of verbal comprehension ability for children with substantial expressive delays or with clinical conditions associated with expressive verbal difficulties."

183.     J.J.'s scores on the multiple-choice subtests of the WISC-V Integrated were higher than scores on the District's WISC-V.  J.J.'s scaled score on the Similarities Multiple Choice subtest of the WISC-V Integrated was 15, "superior", at approximately the 95th percentile, as compared with a scaled score of 5, "low", on the Similarities subtest of the WISC-V. J.J.'s scaled score on the Vocabulary Multiple Choice subtest of the WISC-V Integrated was 5, "low", a full standard deviation higher than his score of 2, "very low", on the Vocabulary subtest of the WISC-V. Dr. Wishner stated that: "When task demands to orally express responses are greatly diminished or removed, as in the WISC-V Integrated, J.J.'s verbal abstract reasoning and word knowledge are revealed to be far better than previously thought."

184.     Dr. Wishner concluded:

the striking differences between J.J.'s obtained scores on verbal measures of the WISC-V and the WISC-V Integrated provide a cautionary reminder that test results provide some indication of current functioning under specified conditions, but not necessarily 'ability.' Altering the specified conditions of verbal tasks presented to J.J., for instance, resulted in strikingly improved performance, casting doubt upon previous estimates of very low intellectual 'ability.'

185.     The District dismissed this and claimed Dr. Wishner's findings were not new, as they knew J.J. did better with associative learning or multiple choice. Dr. Wishner rebutted this as J.J.'s response on the Similarities tests showed that J.J. has abstract verbal reasoning beyond anything the District had documented.

186.     As to recommendations, Dr. Wishner testified that staff could differentiate and design the curriculum to minimize any potential isolation. He noted that "a teaching assistant might help J.J. remain focused on the specialized materials that were prepared for him for use during the classroom observation."

187.     Dr. Wishner doubted that J.J. would be an active verbal participant in reciprocal conversation during instruction but he explained that, for J.J.:

what is critical is he is going to benefit from that exposure, that interaction, in ways that just wouldn't be available in the self-contained classrooms. He wouldn't be exposed to the same curriculum, he wouldn't be exposed to the same student talk, to the same student interaction, to the same engagement with the curriculum as in the general education classroom, and I don't think that because he won't be performing as his general education peers, that it would be a fruitless endeavor.

188.     Dr. Wishner emphasized that humility is required when interpreting test results. He believed there was a real risk that relying upon the obtained test scores for J.J. without the WISC integrated and an understanding of his language background significantly underestimate what he is potentially able to do.

**2020-2021 School Year**

189.     The three (3) CSE meetings from June 2020 and the resulting IEP dated June 30, 2020, only further confirm the District's entrenched and discriminatory perspective on J.J. and contain a litany of errors, which deprived J.J. of a FAPE. Since the last meeting in 2019, J.J. had made remarkable strides and the Parent shared all information.

190.     The CSE initially convened to review J.J.'s progress and to develop a program for the 2020-2021 school year. Ms. Carlisi from Fusion, J.J.'s ELA teacher and a special education teacher, attended and presented Fusion reports. The Science teacher reported that J.J. is on an essentials track in life science, stating, "The essentials track is a 7th grade general curriculum, aligned to NYS common core, with some modifications." To illustrate this, he provided an example of a modification to the curriculum; in teaching the processes of meiosis and mitosis, J.J. just had to know the difference in the processes rather than all of the steps. He described some individualized strategies he was using in instruction, to help J.J. to work on the general curriculum while meeting his unique needs, such as repetition and re-teaching. J.J.'s History teacher reported "tremendous growth" and progress in reading comprehension and vocabulary.

191.     Ms. Carlisi was present at the meeting and noted that J.J. "worked with material that was on a 5th-7th grade level. … He is able to comprehend material when I spend a longer time reviewing it. … [J.J.] still needs assistance with open-ended questions and inferential questions. However, J.J. can answer inferential questions when presented to him in multiple choice format."  Without basis, the CSE questioned the validity of the information provided by Fusion to demonstrate J.J.'s present levels of performance.

192.     The CSE then presented a classroom observation conducted at Fusion in October 2019. As soon as the CSE began discussion, the Parent indicated at the meeting that he had never received the written classroom observation.

193.     Upon initial review of the classroom observation, the Parent noted that it was biased, partial and prejudicial. The CSE case manager, Dr. Bowman, received Fusion worksheets from the Parent few days prior to the meeting and never shared them with the CSE, stating to the Parent it was an oversight on his part.  Due to the District's failure to provide the Parent the classroom observation and to share the worksheets with the CSE, the meeting was adjourned. [10]

194.     The CSE then scheduled a meeting for June 22, 2020.  The District did not invite Fusion although the Parent attempted to do so and informed the District that said staff would not be available.  The District proceeded to hold the meeting notwithstanding their notice as to the unavailability of the Fusion staff.  The District CSE chair then faulted the Parent for not bringing Fusion staff to the meeting and the Parent explained, once again, that he had notified the District that the staff had not been available, but the chair never responded. The CSE adjourned.

---

[10]     Shortly after the June 15, 2020 meeting, the Parent transmitted a letter to the CSE to express vehement disagreement with the written observation report. He explained that the report was inaccurate and biased, as it failed to note, for example, that J.J. worked independently for at least four problems and it characterized him as "emotionless." Dr. Davidow never even acknowledged receipt of the Parent email.

195.    Before the next CSE, the Parent made every effort to cooperate, provided all requested information and facilitated Fusion attendance. He hoped for the CSE to consider the material with an open mind.  This did not occur; the June 30th meeting only showed the gross misjudgment and bad faith of District Defendants.

196.    Procedurally, the CSE did not have a general education teacher present who could comment with authority and care on the general education curriculum or J.J.'s integration into the general education environment.  The PE teacher who attended did not have any expertise on core academic subjects, and her only role at the CSE appeared to be to discuss why the very restrictive adaptive PE was appropriate even though the Parent disagreed and J.J. had been in regular PE in the past, had never been injured, and had no physical needs.

197.    Dr. Bowman, District Psychologist, opened the CSE by summarizing Dr. Wishner's evaluation and noting his disagreement. He attempted to discredit the evaluation by incorrectly stating that Dr. Wishner's recommendations were "largely based on a single outlier score from a subtest administered three times in an 18- month window." Dr. Wishner explained in testimony that that this statement demonstrated a misunderstanding of the WISC-V Integrated.

198.    When the Parent explained at the meeting precisely why Dr. Wishner had used the subtests selected which were adapted from components of the Verbal Comprehension Index, Dr. Davidow dismissed this: "we're not asking you to explain that because wouldn't be in your purview."  The CSE disregarded Dr. Wishner's powerful recommendations:

> Until provided opportunities to be included in general education classrooms, designed with differentiated academic goals; provided continued intensive related services and instructional supports; and assessment adapted to multiple-choice formats, recommendations for alternate assessment are premature. J.J.'s learning abilities have not yet been fully understood. There is evidence his intellectual 'ability' has been under-estimated. Denial of the opportunity to experience well-planned instruction of intellectually stimulating and new curriculum at this time is not appropriate.

It is very likely that as an adult in the future, J.J. will participate fully in his community and contribute meaningfully with his musical talents. Employment as a musician is a very reasonable goal. Successful transition to this adult outcome will require on-going interactions with typical peers in social and educational activity. J.J.'s exclusion from typical classroom settings risks compromising his full access to the adult world of opportunity.

199.    The CSE did not discuss any impact of J.J.'s dual language background, which Dr. Wishner had emphasized was an important consideration in interpreting test results.[11]

200.    From Fusion, Ms. Carlisi and William Hudson, J.J.'s math teacher, participated and Mr. Hudson spoke in detail about J.J.'s progress.    Mr. Hudson reviewed J.J.'s Academic Summary in math and indicated that for math, academically, J.J. is on grade level. J.J. was doing linear algebra and complex equations, whereas in Great Neck, he was lining up pennies.

201.    The IEP reported only negatives on J.J.'s Fusion work and omitted information including that J.J. strove for excellence, followed grade level math and did independent work.

202.    At the meeting, the CSE discussed the math mid-term review sheets used at Fusion containing 130 complex math problems.  The CSE members continued to criticize the work, and inappropriately questioned how much work was done independently.

203.    The Parent noted of the 130 problems, on only about 5 problems, was J.J.'s work not shown when expected. He testified about the misjudgment and noted that they had only focused on the problems that were incorrect, rather than the 125 that were correct.   He expressed dismay on their bias and gross misjudgment and observed that "they just can't wait for the opportunity to marginalize what J.J. does."

204.    Unfortunately, this bias continued when the CSE members reviewed the District's Classroom Observation Report. For years, the CSE had emphasized the importance of J.J.'s

---

[11]    In her testimony, Ms. Kerr, J.J.'s speech pathologist, admitted she did not even know J.J.'s language spoken at home.   She acknowledged that, in general that there were different dialectical things you see in testing and that there are different philosophies on dual language backgrounds in testing.

independence and independent work and his lack thereof as a determinative factor in his restrictive placements and AA designation. Yet, none of J.J.'s independent work was discussed at the meeting.

205. The District dismissed reports of J.J.'s successful participation in the Juilliard pre-college program, including a youth chorus of 40 members, highlighting the difference between J.J.'s ability to be successful in music and his challenges in academic subjects. Of note, the Juilliard program's description states it is designed for students who exhibit the talent, potential and ambition to pursue serious music study at the college level. J.J.'s curriculum at the pre-college program was similar to what a conservatory curriculum would be.

206. The CSE recommended inappropriate goals. For example, Goal 4 only aspired to have J.J., in the course of his eighth-grade year, read a story at the fourth-grade level and correctly answer inferential questions based on the text, and Goal 5 only states that J.J. has to read a story at the 5th grade level and independently identify 2 pieces of text evidence to support the main idea. Many goals were recycled. Transition goals and activities were inappropriate.

207. The District continued to actively preclude J.J. from the opportunity to study music at the college level by denying him the opportunity to pursue a high school diploma. The IEP lists the only option for transition as a SACC, which does not lead to a high school diploma.

208. On alternate assessment, the CSE erred again. The Parent noted that the CSE once again did not follow guidelines for AA. The District misapplied the AA criterion.

209. Initially, Dr. Davidow stated, before any discussion on AA: "I think we've discussed at length that J.J. has a severe cognitive disability in terms of his verbal abilities cognitively, his language abilities, his adaptive abilities and his academics in terms of reading comprehension, writing and math are all in the severe range."

210.    The CSE had new information on J.J.'s math work, his pre-college Juilliard participation, and Dr. Wishner's evaluation and the Parent asked for serious consideration. [12] Yet the CSE refused to consider the new information and erroneously misapplied the criteria:

> **Whether J.J. had a severe cognitive disability and significant deficits in communication/language and significant deficits in adaptive behavior.** Dr. Davidow erroneous concluded: "The overwhelming amount of information indicates he has a severe disability as it relates to functioning in school."
>
> **Whether J.J. required a highly specialized setting.** Dr. Davidow articulated an erroneous, overly broad standard. "Well, highly specialized means that he needs more intensive support than *typical students*. *Typical students* are in a 12:1+1 class following group instruction, following the group activities, taking ... learning from their peers."
>
> **Whether J.J. required medical, psychological supports, or behavioral interventions.** The CSE found that J.J. required behavioral intervention.  Dr. Davidow stated that "Behavior is defined as anything that might be interfering with his acquisition of learning and we have plenty of evidence that he needs a great deal of prompting and support."  Dr. Davidow erroneously stated that J.J. needed behavioral interventions. Dr. Wishner clarified in his rebuttal testimony that that the fact that J.J. needed mediation and support did not mean that he has behaviors that interfere with learning.

211.    The Parent disagreed and asked how a student with the most severe significant cognitive disability would be able to get all As at Juilliard precollege and at Fusion but did not receive an answer except that grading at Fusion was different.  Dr. Davidow noted that "the issue was that his cognitive abilities are so low that he can't act at the typical grade level."

212.    As to transition planning, Dr. Davidow stated that J.J.'s disability may limit him in terms of college. Ms. Lehmuller concurred that J.J. was not displaying skills such as navigating the campus and perspective taking, so college might not be the goal.   The Parent advocated that it was premature to close that window and that J.J. should be in a setting where he had a chance to pursue a high school diploma and his goal to apply to a music conservatory.

---

[12]     The CSE members all chimed in with remarks that showed disregard of parental input and discriminatory considerations. Ms. Lehmuller noted that J.J. was "still much lower than grade level." Ms. Larson said he would not do well with state assessments.  When testifying, she could not remember why but stated she remembered "agreeing for each of the different parts of it that I thought he met the criteria."

213.     As to placement, Dr. Davidow did not even have discussion and stated that, "given the alternate assessment, I'm assuming…everyone is going to recommend that are all recommending the 8:1+2."  All agreed.

214.     Once again, the CSE did not see any benefits to a less restrictive 12:1+1 classroom for J.J.  Ms. Lehmuller just said it was not appropriate.  In contravention and impediment of parent input, the CSE considered and recommended only one predetermined option—continued placement in an 8:1+2 classroom, based on the designation of AA.

215.     On July 22, 2020, the Parent wrote and transmitted a letter to the CSE outlining serious disagreement and over ten (10) substantive inaccuracies and omissions in the written IEP and Comments, which prejudiced the Parent and falsified the record of the meeting. The Parent disagreed with the placement and goals and provided notice of J.J.'s placement at Fusion.

**Progress at Fusion 2020-2021**

216.     Due to the inappropriate IEP and discrimination, the Parents maintained J.J.'s placement at Fusion for 2020-21. Despite the difficulty of remote instruction during the COVID-19 pandemic, J.J. progressed well and received specially tailored services for his unique needs.

217.     At Fusion, J.J. is working on grade level work and is on a trajectory to receive a high school diploma.

218.     Communication of J.J.'s class work was carried over to the home in daily summary updates from each teacher. Teachers have documented his progress in the updates.

219.     J.J.'s instructors employ specially designed instructional strategies that allow J.J. to make progress and to access the material and engage with his learning. These include, but are not limited to, re-teaching concepts as needed, scaffolding questions, paraphrasing, practicing and rehearsing difficult skills and providing individualized ways of showing mastery.

220.     As a result, J.J. is academically engaged with his learning, participates in all of his courses and takes pride in his academic accomplishments. He also works independently.

221.     While J.J. has opted for remote learning since March of 2020 and there have thus been limited social interaction opportunities given the coronavirus pandemic, when J.J. was in the physical school building, he engaged socially with his peers on a regular basis at Fusion's Homework Café. He was growing meaningfully both socially and emotionally.

222.     J.J.  made meaningful progress at Fusion during the 2020-21 school year.

**HO Correctly Found Denial of FAPE for each School Year from 2016-17 through 2020-21**

223.     The Parents filed a Due Process Complaint under the IDEIA and Section 504 on December 14, 2018. The Impartial Hearing lasted 41 days and based on the Record, the IHO found that the District denied J.J. a FAPE for every school year in the Complaint.  Exhibit "A."

224.     The IHO found "a denial of FAPE for 2016-2017 based upon the criteria of how the IEP must be "reasonably calculated to provide some 'meaningful' benefit" and failed to address his pronounced language disorder and provided OT instead, failed to provide ESY (even when the District made the AA determination), and failed to conduct an FBA/BIP. The District did not meet its burden for FAPE this school year." Exhibit A, IHO Decision ("Decision"), p. 20.

225.     For the 2017-2018 school year, the IHO found that the District "failed to provide the appropriate special education, failed to evaluate, provide measurable and challenging goals, conduct an FBA/BIP, and failed to address his pronounced language disorder in order for this Student to progress." Exhibit A, Decision, p. 29.

226.     For the 2018-2019 school year, the IHO, on p. 44, ruled that, based on the IEPs:

Considering the 3 CSEs, and the analysis of the goals and progress, the District did not offer FAPE to the Student for the 2018-2019 school year. CSE failed to evaluate and to assess the Student's present levels, considering additional information provided, such as his private tutor, mastery in music showing his learning abilities, along with the October 2018 psychological evaluation showing that he does not have a severe cognitive

disability, in the development of the Student's IEP for the 2018- 2019 school year, and therefore failed to consider any alternatives, including the least restrictive program (LRE infra) for the Student. (Citations omitted).

227.    For the 2019-20 school year, the IHO, at p.51 of the Decision, found that:

the District denied FAPE to the Student for 2019-2020 school year as the IEP did not address all of his needs relating to his language; the goals were arbitrary in its levels, did not address his vocabulary deficits and lack foundational concepts, and the absence of an FBA/BIP continues. The CSE had examples where Student was thriving – acceptance at the Julliard Pre-college and his engagement at the Private School. The CSE failed to evaluate in areas that could be used to draw the Student's attention, engage the Student in instruction in order for him to access learning, failed to address his pronounced language disorder, and to consider additional supplementary aides and services in the development of the student's IEP for the 2019- 2020 school year and therefore failed to adjust and or consider any alternatives, including a LRE (infra) for the Student."

228.    For the 2020-21, the IHO, at p. 55-56, ruled that the District denied J.J. a FAPE:

The Private Psychologist opined that the student had been inappropriately placed throughout his educational experience and that his language disabilities had not been properly addressed. According to the Private Psychologist, the Student's learning abilities have not been fully understood, and he required an integrated setting that is well planned with supports and services and intellectually stimulating." (citations omitted).

229.    For every year at issue, the IHO found that the District failed to provide FAPE, based on, e.g., the failure to properly evaluate the Student. The IHO (p. 57) ruled the District:

failed to adequately tease out language and or cultural concerns when raised by the 1st private psychological exam.  Considering the needs already expressed in the domain of language and the limited progress. District's witness stated, "understanding of language and then using language – that is very important".  Regardless, with the emerging mastery by the Student when his accomplishments showed, the District continued not to question or further evaluates the Student to determine how the Student was able to thrive in a higher educational setting where he pursued his course work independently in his career of interest. It appears the Student mastered music and played individually (from memory and adapted during performances to the needed pieces) and/or with a group in an ensemble and/or orchestra (ability to understand instruction, complete tasks independently, work and exchange with peers). The Student was able to function in a group setting, gain knowledge, comprehend, adapt, and analyze there. (citations omitted).

230.    The IHO also, based on the well-documented record, found a denial of a FAPE for the 2016-2017, 2017-2018, 2018-2019, 2019-2020, and 2020-2021 school years as the District also improperly designated J.J. as being eligible for alternate assessment.  The IHO, on p. 67 found:

I find that the Student was improperly designated as an alternately assessed student. The alternate assessment, amongst other things, prevents the student from taking regents examinations, retaining his high school diploma, pursuing a career development and occupational studies ("CDOS"), which would allow him to develop a career plan, employability profile and document his preparation for entry-level employment after high school and inhibits his outcome and ability to attend a music conservancy.

231. The IHO further found a denial of FAPE based on the inadequate reading program. She ruled that: "The CSE's decision not to include a specific reading program to provide the Student with specially designed reading instruction resulted in a substantive denial of FAPE for the 2018-19 school year." Decision, p. 72.

232. The IHO found that the District had failed to place J.J. in the LRE. The IHO, on p. 76, ruled that:

The IEP did not offer any mainstreaming opportunities for the Student (other than Music) which is critical for his social, emotional, transitional, and behavioral development. Last, the placement offered by the District was not within the functional similar peer group for the Student. … "The LRE is a non-academic restriction or control on the IEP"—separate and different from the measure of substantive educational benefits— "that facilitates the IDEA's strong 'preference for mainstreaming handicapped children'"…The student's LRE is a high school diploma. (citations omitted).

233. The IHO, in a well-reasoned analysis, further appropriately found that Fusion was an appropriate placement for J.J. and awarded tuition reimbursement for the 2018-19 (Jan.- June 2019) 2019-2020, 2020-21 school year. *See* Exhibit A.

234. The IHO further sustained relief for the cost of the Private Psychologist (Dr. Kim) and the Private Inclusion Psychologist's evaluations (Dr. Wisher) and any speech-and-language-related services for the time period January 2019 through June 2019, 2019-2020 and 2020-2021 school years. The District did not appeal the granting of this relief and the SRO did not address it and it is thus final.

**IHO Error on Predetermination and Impeding Parental Input**

235.     The IHO erred by not finding predetermination.  Contrary to the Record, she ruled that "Other than the [CSE] held December 6, 2016, I do not find that the District thwarted the Parent to participate at the CSE's and/or in his son's education." Decision, p. 71.

**IHO Error on Section 504**

236.     The IHO ruled she did not have the "requisite jurisdiction" to rule on Section 504.

237.     The IHO found that she had limited jurisdiction on the Section 504 claim.  She then, erroneously, did not find bad faith and/or gross misjudgment as she did not find the District's conduct to be "knowing, intentional, reckless, and gross." Decision, pp. 78-79.  This is an erroneous standard, as intentional conduct is not required to show a Section 504 violation.

238.     To state a claim for a violation of § 504, a plaintiff is not required to show personal animosity or ill will. Rather, intentional discrimination may be inferred when a policymaker acted with at least deliberate indifference to the strong likelihood that a violation of federally protected rights will result from the implementation of the challenged policy.

239.     The Record shows that Defendants acted with deliberate indifference to J.J.'s rights to access his education and bad faith and gross misjudgment.

240.     To exhaust administrative remedies, the Parents cross appealed the finding to the SRO, but the SRO ruled, at p. 11, that he lacked jurisdiction to address the Section 504 claim.

**SRO Correctly Found Denial of FAPE and Denial of LRE**

241.     On October 22, 2021, the SRO issued a Decision ("SRO Dec.") and correctly affirmed that the District had denied J.J. a FAPE in the LRE for every year in question, but erred, primarily, in reversing the claim for tuition reimbursement.  Exhibit B.

**SRO Decision Not Well-Reasoned or Thorough in All Respects**

242.    The SRO acknowledged that he did not do a thorough job in reviewing the matter or rendering a Decision, as he found the process of examining a 41-day hearing record within 30 days and providing a thorough and careful analysis to be essentially impossible.  SRO Decision, p. 16. He claimed he faced a "Hobson's choice of either addressing all the disputed issues that required resolution and violating IDEA timelines or addressing what I view as the most critical or dispositive points…" *Id.*, p. 16.  This admission alone sets the basis for reversible error and the SRO's decision was not well-reasoned. He erred on many essential points, such as the basis for a denial of FAPE, the analysis on alternate assessments and in finding that the private school was inappropriate. However, the SRO did appropriately uphold the IHO Decision that the District denied J.J. a FAPE for every year in question and failed to educate J.J. in the LRE.

**SRO Erred in Finding that Fusion was not Appropriate**

243.    The SRO correctly found that "Fusion provided some specially designed instruction to meet the student's academic needs…" and that J.J. made progress in certain areas. SRO Dec. at 79. This should have been sufficient to find Fusion appropriate. However, the SRO erred in finding that J.J.'s progress was subjective and that the 1:1 instruction did not meet his unique needs, as the law requires specially tailored, not specifically tailored instruction.

244.    The SRO found that Fusion was not an appropriate placement for J.J. due, in part, to its inappropriate speech language services, based on his analysis that the IHO found a denial of FAPE based on inappropriate language services. SRO Dec., pp. 79-81. In fact, the IHO found a denial of FAPE for every year based on, *inter alia*: inappropriate IEP goals, de minimis progress, the AA designation and failure to place J.J. in the LRE, with the general curriculum.

245.    The SRO failed to note that Fusion addressed a fundamental deficiency in the District special education program, as Fusion provided individualized instruction that allowed J.J. to make progress toward grade level work. The District program for J.J. set low expectations.

During the 2018-19 school year, at the District, the teachers noted behaviors that impeded J.J.'s learning such as laughing uncontrollably. At Fusion, these behaviors were not present.

246. The SRO ignored J.J.'s dramatic progress at Fusion. The detailed Record (including his worksheets, exams and academic summary) shows that, at Fusion, J.J. was presented with grade level curriculum and made progress.

247. The SRO further did not acknowledge the important of J.J.'s progress in the general education curriculum and failed to note that the District did not show that J.J. received any work that approached his grade level. The Record shows that J.J. was given low-level elementary school work and, when J.J.'s 6th grade teacher at Great Neck was asked to provide *any* work that approached grade level, she could not provide a single page of evidence. The SRO ignored that Fusion provided J.J. with access to the grade-level general education curriculum as well as the ability to work toward a high school diploma.

**SRO Erred by Finding that the Decision on Alternate Assessment (AA) was Appropriate**

248. The SRO erred in finding that alternate assessments were appropriate for J.J. and indeed applied the incorrect standard, as he found that "the hearing record showed that the student would not have been successful participating in State or district wide assessments." SRO Dec., p. 32. This is not the IDEIA or NYS standard.

249. In the AA analysis, the SRO further erroneously noted that "the IHO does not adequately explain why the CSE must adopt the viewpoints of the private expert." (pg. 34, footnote 13). The IHO was not trying to explain why the CSE must adopt the viewpoints of the private expert but pointed out that even by the District's own evaluation and conclusions, J.J. should not have been designated AA because he did not meet all the criteria.

250. The SRO erred in ignoring the IHO analysis showing that the CSE made a mistake by not applying the full IDEIA standards, but more critically, that a student cannot be

recommended for AA simply "due to significant language deficits." The District CSE made the AA Decision "[a]fter reviewing adaptive and speech language evaluation, the Committee recommends alternative assessment due to significant language deficits." Only in the hearing testimony did the District's witnesses claim that J.J. met all the AA criteria.

251. The SRO further incorrectly faulted the IHO by stating that she shifted the AA standards by requiring a "severe cognitive disability," (SRO Dec. p. 34) when NYS guidance documents require that to be eligible for AA, a student must have "a severe cognitive disability."

252. The SRO further erred in not addressing or noting the District's failure to inform the parents on the impact of AA on the high school diploma. This was a monumental disservice to the Student and a violation of the IDEA, as well as Section 504 and the ADA.

253. The Defendants' failures on designating the Student as AA for a long period of time deprived him of access to the general education curriculum, state-mandated assessments and appropriate services for years and showed bad faith, gross misjudgment and discrimination.

254. To the extent that the Court upholds the SRO ruling on tuition reimbursement under IDEIA, Plaintiffs seek tuition reimbursement and other relief under Section 504 and ADA.

## AS AND FOR A FIRST CAUSE OF ACTION
## FOR VIOLATING THE INDIVIDUALS WITH DISABILITIES EDUCATION
## IMPROVEMENT ACT

1. Plaintiffs incorporate and repeat each and every allegation set forth above.

2. The Hearing Record is well documented, as validated by the IHO and the SRO that the District denied J.J. a FAPE in the LRE from the 2016-2017 to 2020-2021 school years.

3. As the District failed to provide J.J. a FAPE for 2016-2017, 2017-2018, 2018-2019, 2019-2020 and 2020-2021, the Plaintiffs were entitled to place their child unilaterally in an appropriate private placement and seek reimbursement.

4.      The Parents placed J.J. at Fusion from Jan. 2019 through June 2019, 2019-2020 and 2020-2021. The IHO appropriately ruled that they are entitled to tuition reimbursement, as Fusion provided specially tailored services for J.J. and equities support the claim. *See* Exhibit A.

5.      The SRO erred in reversing the IHO ruling that Fusion was not appropriate for J.J., as the IHO and SRO found that Fusion provided specially-tailored services for J.J.

6.      The Parents are entitled to reimbursement for full Fusion tuition requested, as well as evaluations and for compensatory services and reimbursement for tutoring services.

**AS AND FOR A SECOND CAUSE OF ACTION**
**FOR VIOLATING SECTION 504 OF THE REHABILITATION ACT OF 1973**

7.      Plaintiffs incorporate and repeat each and every allegation set forth above

8.      The Defendants' violations in educating J.J. transcend IDEIA violations and show that the District violated J.J.'s civil rights by excluding him from access to typical peers and from the general education curriculum. Section 504 prohibits the exclusion from participation in or being denied the benefits of or being subjected to discrimination under any educational program.

9.      J.J. is diagnosed with autism and has been classified as a student with a disability and is protected by Section 504, as described herein.

10.     The Board, the District and the individual Defendants in their official and individual capacities violated Plaintiffs' rights under Section 504 by denying him the benefits of full equal access to the educational opportunities and activities offered to non-disabled children.

11.     The Board, the School District, and the individual  Defendants in their official and individual capacities, have shown gross misjudgment and bad faith in their actions to J.J. and to his family, by, *inter alia,* segregating J.J. in restrictive placements where he was deprived of work in the general education curriculum; making discriminatory statements about his abilities; making an erroneous decision on AA, which deprived him of access to state assessments and

impacted his ability to achieve a diploma; failing to inform the Parents of the effects of AA on a high school diploma in violation of the law, and maintaining a segregated placement.

12. Defendant's discrimination against Plaintiff was due to his disability.

13. The segregation, discrimination and low expectations that Defendants inflicted on J.J. exacerbated and aggravated the impact of his disabilities on his education and achievements.

14. Plaintiffs were damaged as a result of Defendants' acts and are entitled to damages, including tuition reimbursement, compensatory damages, damages for emotional distress, attorney fees and other losses and such other relief as the Court deems appropriate.

## AS AND FOR A THIRD CAUSE OF ACTION
## FOR VIOLATING THE AMERICANS WITH DISABILITIES ACT

15. Plaintiffs incorporate and repeat each and every allegation set forth above.

16. Title II of the ADA and its Regulations apply to state and local government entities and protect individuals from discrimination on the basis of disability.

17. The ADA prohibits exclusion from participating in or being denied the benefits of services, programs or activities of a public entity or being subjected to discrimination by same.

18. J.J. is a child with a disability as defined by the ADA.

19. Defendants have violated Plaintiffs' rights under the ADA by denying him the benefits of receiving full and equal access to the educational opportunities and activities offered by Defendants to non-disabled children.

20. The Defendants discriminated again J.J. by depriving him of equal educational opportunities that were offered to non-disabled students, such as the full state-mandated curriculum, instruction aligned with state learning standards, and state-mandated assessments.

21. Defendant's discrimination against plaintiff was solely due to his disability.

22.     As a direct and proximate cause of Defendants' violations of the ADA, J.J. received inferior education to that provided to non-disabled peers, thus jeopardizing his future educational prospects and his ability to work independently.

23.     The segregation, discrimination and resulting low expectations Defendants inflicted upon J.J. exacerbated and aggravated his disabilities.

24.     Plaintiffs were damaged as a result of Defendants' acts and are entitled to damages, including tuition reimbursement, compensatory damages, damages for emotional distress, attorney fees and other losses and such other relief as the Court deems appropriate.

## AS AND FOR A FOURTH CAUSE OF ACTION
## AGAINST ALL DEFENDANTS PURSUANT TO 42 USC SECTION 1983

25.     Plaintiffs incorporate and repeat each and allegations set forth above.

26.     Defendants, acting under color of state law, violated Plaintiffs' constitutional right to equal protection of the law as guaranteed by the Fifth and Fourteenth Amendments.

27.     The Board and District and the District Defendants in their individual and official capacities, all deprived J.J. of his access to an education in the LRE and the general education curriculum and the right to work toward a diploma, based on official Board and District policy and customs to segregate students based on any perceived or diagnosed intellectual disabilities.

28.     All Defendants in their individual and official capacities were personally involved in the deprivation of J.J. to have access to typical peers and to the NYS curriculum.

29.     The Defendants, acting under color of state law, violated the J.J.'s rights to be free of discrimination on the basis of disability in education as guaranteed by Section 504, IDEIA and the ADA and the U.S. Constitution.

## RELIEF SOUGHT

Wherefore, J.F.J. and E.Y. for themselves and on behalf of J.J., respectfully request that this

Court review the administrative record on a modified *de novo* basis and, based on such review:

a. Uphold the SRO determination that the District failed to offer J.J. a FAPE in the LRE for the 2016-2017 through 2020-2021 school years.

b. Declare that Plaintiffs' placement of J.J. at Fusion Academy was appropriate and reasonably calculated to confer an educational benefit upon him, for the 2018-2019 (from January-June), 2019-2020 and 2020-2021 school years, and order reimbursement of tuition and all related costs and thus uphold IHO order on tuition reimbursement and reverse the SRO decision denying reimbursement.

c. Declare that the equities favor the Plaintiffs and do not preclude or diminish a reimbursement award;

d. Declare that the District violated Section 504 as Defendants discriminated against J.J., in denying J.J. access to the LRE and the general education curriculum and find that the IHO erred in finding no jurisdiction over Section 504 claims and award appropriate relief, including tuition reimbursement, under Section 504;

e. Find that the District violated the ADA;

f. Award Prejudgment interest;

g. Declare Plaintiffs to be the substantially prevailing party and grant leave to plaintiffs' counsel to submit a fee application for purposes of statutory attorneys' fees and other recoverable costs at the administrative level, the SRO level and in this action, pursuant to the express fee-shifting provisions of the IDEIA and Section 504; and

h. Grant Plaintiffs such other, further relief as the Court may deem just and proper.

Dated:  February 22, 2022
     Rye Brook, New York

                           */s/  Arshi Pal*
                           Arshi Pal, Esq.
                           LITTMAN KROOKS LLP
                           Attorneys for Plaintiffs
                           800 Westchester Avenue, S-436
                           Rye Brook, NY 10573
                           (914)684-2100

Of Counsel:  Marion M. Walsh, Esq.